# TATA COMMUNICATIONS

## TELECOMMUNICATION SERVICES AGREEMENT

This Telecommunication Services Agreement ("Agreement") is made and entered into as of this December 17, 2008 ("Effective Date"), by and between the following parties (each a "Party" and jointly, the "Parties"):

| | |
|---|---|
| Tata Communications (America) Inc. | KTC Telecom LLC |
| Carrier Name ("Carrier") | Company Name ("Company") |
| 2355 Dulles Corner Blvd., Suite 700 | 1001 SW 5th Avenue, Suite 1100 |
| Address | Address |
| Herndon, VA 20171 | Portland, OR 97204 |
| Province/State/Country/Postal Code | Province/State/Country/Postal Code |
| Delaware, USA | Portland, OR, USA |
| Place of Incorporation | Place of Incorporation |

All capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Agreement, Service Addenda and Order Form(s). The Parties wish to provide to and purchase from each other telecommunications services on the following terms and conditions:

1. **SERVICES:** Each Party agrees to provide to and purchase from the other Party, the selected telecommunications service(s) as set forth in any Service Addenda referencing this Agreement (the "Services"). For Services provided by Carrier to Company, the applicable rates shall be based upon the respective circuit, trunk, network domain, IP address and/or interconnecting gateway.

2. **TERM:** This Agreement shall enter into effect on the date it is accepted by Carrier in writing (the "Effective Date") and shall continue for an initial term ("Term") as set forth in the applicable Service Order Form(s) and shall automatically renew for equivalent successive renewal Terms for the duration of the Service unless terminated by either Party pursuant to this Agreement. Notwithstanding the foregoing, either Party may terminate this Agreement or any Services provided hereunder at any time during the Term, or any renewal thereof, by providing a thirty (30) day prior written notice of termination to the other party. Notwithstanding the above, the Term of this Agreement shall extend through the term of any then current Minimum Service Term as set forth in any Service Addenda or Service Order Form(s).

3. **CREDIT LIMIT:** Each Party agrees to a Credit Limit and terms for the purchase of the Services as set forth in the applicable Service Order Form(s)

4. **CASH DEPOSIT.** On or before the commencement of Services, the supplying Party may require a Cash Deposit as set forth in the applicable Service Order Form(s). The supplying Party may draw upon the Cash Deposit at any time to recover any amounts due and unpaid in which case the Party providing the Cash Deposit shall immediately replenish it to its prior value. The Parties shall not waive any of their rights or remedies by drawing upon the Cash Deposit to recover overdue or unpaid amounts. In the event that a Party draws upon the Cash Deposit, it may suspend the provision of Services until the Party providing the Cash Deposit replenishes it to its original value. If at any time, a Party's usage exceeds the Credit Limit, its payment history is or becomes unacceptable to the other Party, or a Party's Service is upgraded, the other Party may require such Party to provide, modify, or increase the amount or form of the Cash Deposit. The Party providing the Deposit shall have five (5) business days from the receipt of the requesting Party's written request to comply with this request, and if it fails to do so, the requesting Party may immediately suspend the delivery of Services and/or terminate this Agreement without further notice or demand.

5. **LETTER OF CREDIT:** On or before the commencement of Services, the supplying Party may require a Letter of Credit which shall be unconditional and irrevocable, issued by a financial institution acceptable to the supplying Party in its sole discretion, renewed or replaced no later than 30 days before its expiration date, and otherwise acceptable in form and substance to the supplying Party. The Letter of Credit is considered a cash fund to be drawn by presentment of a sight draft by the supplying Party at any time to recover any amounts due and unpaid by the purchasing Party. The purchasing Party waives all rights to dispute, intervene in, or enjoin the presenting or honoring of sight drafts, or funding of the Letter of Credit.

6. **NET SETTLEMENT:** Net settlement of invoices shall occur, such that the undisputed balance due from one Party shall be offset by the balance due from the other Party (the "Net Settlement Procedure"). The Net Settlement Procedure shall result in a net amount due from the debtor Party to the creditor Party (the "Net Settlement Amount"). The debtor Party shall pay the Net Settlement Amount to the creditor Party (1) in the Applicable Currency, (2) by wire transfer or such other method as the Parties may mutually agree, and (3) within the applicable Payment Period

7. **SETOFF:** Notwithstanding anything contained herein or in any other agreement between the Parties and their respective subsidiaries, parents and/or affiliates ("Setoff Parties"), the Setoff Parties agree and acknowledge that they have the right to setoff the amounts owed by one Setoff Party to the other for the services provided, whether under this Agreement or any other agreement between the Setoff Parties. The setoff shall accrue on a daily basis and shall be reconciled in a net settlement in accordance with the applicable invoicing period. The Setoff Parties expressly acknowledge that the failure of the Setoff Parties to exercise the right of setoff during any invoicing period shall not be deemed a waiver of that right.

8. **NET OF TAXES:** All pricing for Services and other charges due hereunder are exclusive of all applicable taxes, including value added tax, sales taxes, duties, fees, levies or surcharges (including where applicable any Universal Service Fund or similar surcharges) imposed by, or pursuant to the laws, statutes or regulations of any governmental agency or authority, all of which shall be the sole responsibility of the Party purchasing the applicable Services and paid promptly when due by such Party, and furthermore, such Party agrees to indemnify and hold the other Party harmless from any liability therefor. Except as set forth herein, all amounts payable by the Parties under this Agreement shall be made without any deduction or counterclaim and, except to the extent required by any law or regulation, free and clear of any deduction or withholding on account of any tax, duty or other charges of whatever nature imposed by any taxing or governmental authority. If a Party is required by any law or regulation to make any such deduction or withholding, such Party shall, together with the relevant payment, pay such additional amount as will ensure that the other Party actually receives and is entitled to retain, free and clear of any such deduction or withholding, the full amount which it would have received if no such deduction or withholding had been required.

9. **LATE PAYMENT CHARGE:** Debtor Party shall pay a late charge of 1.5% per month of undisputed amounts, or the highest lawful amount, whichever is higher, on any amount owed but not paid by the applicable Due Date.

10. **DISPUTES:** The Parties agree to pay any undisputed amounts due by the Due Date. Any bona fide dispute that a Party may have concerning an invoice must be brought to the other Party's attention by written notice, in hard copy or electronic format, within sixty (60) days of receipt of the invoice with sufficient evidence and documentation for the billing Party to analyze the dispute. The billing records of both Parties shall be used to resolve such dispute. The Parties shall cooperate in good faith to resolve any such disputes within a 45-day period thereafter. If either Party brings legal action for the recovery of any amounts due from the other Party under the Agreement, the non-prevailing Party shall pay the prevailing Party's reasonable attorneys' fees, collection fees and costs actually incurred by the prevailing Party.



TATA

Page 1 of 3 – Main Terms


- PROPRIETARY AND CONFIDENTIAL Ver. 11 1-

## TATA COMMUNICATIONS

11. **SUSPENSION/REDUCTION/TERMINATION:** In addition to any other rights at law or in equity, a Party may immediately and without notice, suspend the delivery of Services, reduce the Services and/or terminate this Agreement in the event that the other Party: (i) fails to provide a Deposit as required in this Agreement; (ii) exceeds the Credit Limit; (iii) fails to make payment when due; or (iv) becomes insolvent or bankrupt or ceases paying its debts generally as they mature. In the event that either Party commits a breach of any of the terms of this Agreement (other than as set forth supra in (i) through (iv) above) and fails to remedy such breach within thirty (30) days after receipt of written notice thereof, a Party may suspend the delivery of Services, reduce the Services and/or terminate this Agreement, in addition to any other rights at law or in equity. In the event of any termination of this Agreement, each Party shall pay the other Party for all Services rendered through and including the date of termination. Company understands and agrees that any breach by Company of its obligations under this Agreement shall also be deemed a breach by Company of its obligations under any other agreements it has entered into with Carrier and/or its affiliates and understands and agrees that such breach shall authorize Carrier and/or any of its affiliates to immediately suspend performance under, and/or terminate, said agreements with Company for default if such breach(es) have not been cured within the time provided for in this Agreement.

12. **LIMITATION OF LIABILITY:** The Parties acknowledge that they have no control over how a foreign administration or third party carrier establishes its own rules and conditions pertaining to international telecommunications services. The Parties agree that they shall not be liable to each other for any loss or damage sustained by the other Party, its interconnecting carriers, its customers or end users due to any failure in or breakdown of the communication facilities associated with providing the Services, for any delay, interruption or degradation of the Services whatsoever shall be the cause or duration thereof, or for any other cause or claim whatsoever arising under this Agreement. In no event shall either Party be liable to the other Party for consequential, special or indirect losses or damages sustained by them or any third parties in using the Services howsoever arising and whether under contract, tort or otherwise (including, without limitation, third party claims, loss of profits, loss of customers or damage to reputation or goodwill).

13. **ASSIGNMENT:** This Agreement is personal to the Parties and may not be assigned or transferred by either Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld; except that Carrier may assign this Agreement without consent to: (i) any affiliated entity; (ii) a successor in interest whether by merger, reorganization or otherwise, or (iii) a purchaser of all or certain assets. Carrier may also assign any receivable that arises under this Agreement, any right to receive payment related to that receivable and any interest in that receivable or right to receive payment.

14. **FORCE MAJEURE:** No failure or omission by either Party to carry out or observe any of the terms and conditions of this Agreement (other than any payment obligation) shall give rise to any claim against such Party or be deemed a breach of this Agreement if such failure or omission arises from an act of God, an act of Government, any cause reasonably beyond the control of a Party, or any other circumstance commonly known as force majeure.

15. **PUBLICITY, CONFIDENTIALITY:** For a period of two (2) years from the date of disclosure thereof, each Party shall maintain the confidentiality of all information or data of any nature ("Information") provided to it by the other Party hereto provided such Information contains a conspicuous marking identifying it as "Confidential." In the case of oral information, such Information is characterized as "Confidential" in writing sent by the disclosing Party to the other Party within fifteen (15) days of disclosure thereof. Each Party shall use the same efforts (but in no case less than reasonable efforts) to protect the Information it receives hereunder as it accords to its own confidential and proprietary information. The above requirements shall not apply to Information which is already in the possession of the receiving Party through no breach of an obligation of confidentiality to the disclosing Party or any third party, is already publicly available through no breach of this Agreement or has been previously independently developed by the receiving Party. This Agreement shall not prevent any disclosure of Information pursuant to applicable law or regulation, provided that prior to making such disclosure, the receiving Party shall use reasonable efforts to notify the disclosing Party of this required disclosure.

16. **DISCLOSURE:** Without obtaining the prior written consent of the other Party hereto, a Party shall not (i) refer to itself as an authorized representative of the other Party in promotional, advertising or other materials, (ii) use the other Party's logos, trade marks, service marks, or any variations thereof in any of its promotional, advertising, or other materials, or (iii) release any public announcements referring to the other Party or this Agreement.

17. **NOTICES:** All notices, requests or other communications hereunder shall be in writing, addressed to the Parties at the address indicated herein. Notices mailed by registered or certified mail shall be deemed to have been received by the addressee on the fifth business day following the mailing or sending thereof. Notices sent by facsimile shall be deemed to have been received when the delivery confirmation is received.

18. **COMPLIANCE WITH LAWS:** This Agreement and its continuance hereof is contingent upon the obtaining and the continuance of such approvals, consents, governmental and regulatory authorizations, licenses and permits as may be required or deemed necessary by the Parties, and the Parties shall use commercially reasonable efforts to obtain and continue same in full force and effect. The Parties shall not use the Services in any manner or for any purpose which constitutes a violation of applicable laws or regulations in any jurisdiction in which the Services are being provided. The Parties agree that this Agreement is being entered into pursuant to those provisions of the Communications Act of 1934, as amended, and applicable state laws that provide for the sale of telecommunications services among carriers and that all services are being provided pursuant to the rates, terms and conditions set forth in this Agreement and not pursuant to any tariff on file with the Federal Communications Commission or any state or similar regulatory authority. The Parties further agree that the rates, terms and conditions set forth herein and in all associated addenda and order form(s) hereof shall take precedence over any inconsistent rates, terms and conditions in any federal, state or similar tariff, that neither Party shall not have the right to assert the preeminence of its tariffs over any rate, term or condition set forth in this Agreement or any associated addenda or order form and that any such action by either Party shall be deemed a material breach hereof. The Parties acknowledge their awareness of (i) the U.S. national do-not-call requirements and rules set forth in 47 CFR §64.1200 and 16 CFR Part 310. The Parties are in compliance with the Federal Communications Commission's CPN rules. The Parties shall indemnify each other against any violation of the terms of this Article 18.

19. **SEVERABILITY AND WAIVER:** If any part/provision of this Agreement is or becomes illegal, invalid or unenforceable, that part/provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the validity or enforceability of the remaining parts/provision of this Agreement. No waiver by either Party to any provisions of this Agreement shall be binding unless made in writing.

20. **RELATIONSHIP OF THE PARTIES:** The relationship between the Parties shall not be that of partners, and nothing herein contained shall be deemed to constitute a partnership between them, a joint venture, or a merger of their assets or their fiscal or other liabilities or undertakings. Neither Party shall have the right to bind the other Party, except as expressly provided for herein.

21. **GOVERNING LAW:** This Agreement shall be governed by the laws of the state of Virginia without reference to its principles of conflict of laws. The Parties irrevocably consent and submit to personal jurisdiction in the courts of the state of Virginia for all matters arising under this Agreement.

22. **ENTIRE AGREEMENT:** This Agreement, including the relevant Order Form(s), Addendums and Amendments hereto represents the entire agreement between the Parties and supersedes and cancels all previous negotiations, agreements or commitments (whether written or oral) with respect to the subject matter hereof. Notwithstanding the foregoing, any financial documents and/or representations provided by a Party pertaining to the credit application and/or financial information shall be deemed a part of this Agreement and the disclosing Party shall be responsible for advising the other Party of a material change in the disclosing Party's financial condition. Except as otherwise agreed herein, this Agreement may only be modified by a writing signed by authorized representatives of both Parties. The headings in this Agreement are for convenience of reference and shall not affect its construction or interpretation.

Page 2 of 3 — Main Terms



TATA

- PROPRIETARY AND CONFIDENTIAL Ver. 11.1-

## TATA COMMUNICATIONS

In the event of any conflict, inconsistency or ambiguity between the terms of this Agreement, any Order Form(s) and/or the Tariffs, the interpretation shall be resolved by giving precedence to such documents in the following descending order: (a) the Order Form(s)/Annex(es); (b) the service Addenda; (c) this Agreement; (d) the Tariffs. This Agreement may be executed in as many counterparts as may be required, each of which when delivered is an original but all of which taken together constitute one and the same instrument. This Agreement may be executed by facsimile and the facsimile execution pages will be binding upon the executing Party to the same extent as the original executed pages.

IN WITNESS WHEREOF, the Parties have executed this Agreement in duplicate, or caused this Agreement to be executed in duplicate by a duly authorized officer, as of the Effective Date.

| By: Tata Communications (America) Inc. ("Carrier") | By: KTC Telecom LLC ("Company") |
|---|---|
| Authorized Signature | Authorized Signature: *[signed]* |
| Name and Title | Name and Title: CJ SINGH  CEO |
| Date | Date: 12/17/8 |

Approved as to Form:
LEGAL DEPARTMENT
By: *[signed]*
Name: Krista Newton
Date: __/__/__
VINT/LD/004-06



TATA

Page 3 of 3 – Main Terms

- PROPRIETARY AND CONFIDENTIAL Ver. 11 1-